## United States District Court

## Southern District of Florida

Case No:_____

**Maurice Symonette**

**Plaintiff**

**Vs**



**City of North Miami**
**City Manager Larry Spring**
**City Attorney Jeff P.H. Cazeau**
**Sea Tow Towing**
**Westbrook Towing**
**John Quirino of Quirino Construction**
**City of North Miami Police Department**

**Defendant(s)**

_____/

## Complaint

## Discrimination and Distruction of home and Illegal Yacht Sinking and Theif under The Color Of Law

1) **First Cause of Action: Violation of the 1964 Discrimination Act**
2) **Second Cause of Action: Violation of FL Statue 823.11**
3) **Third Cause of Action: Violation of The City of North Miami Ordinance 10-19**
4) **Fourth Cause of Action: Violation of FL Statue 705.101.6**
5) **Fifth Cause Of Action: Violation of FL Statue 760.51**
6) **Sixth Cause of Action: Violation of FL. Statue 705.101.3**

7) **Seventh Cause of Action:  Violation of City of North Miami municode Sec.5-602.- Dock** of **The City of North Miami Code**
8) **Eighth Cause of Action**: Violation of FL Statue 705.103.2b
9) **Ninth  Cause OF action: Violation of the 14th Amendmendment you cannot take a Persons Life, Liberty or Property.**

# Introduction

Now comes Maurice Symonette, owner of the **Yacht Victory** to sue **The City of North Miami, City Manager Larry Spring, City Attorney Jeff H. Cazeau, Sea Tow Towing, Westbrook Towing, John Quirino of Quirino Construction** for the illegal seizure of his Yacht named **Victory** on May 17, 2016 from 1977 NE 119th Road, North Miami, FL  33181. According to the City of North Miami ordinances they were supposed to get a court order from the Court Magistrate in order to seize the Yacht which they never did. According to the City of North Miami Ordinance 10-19they were suppose to only charge him $250.00 dollars a day.

 In addition, Florida Statue 823.11 and Florida Statue 827.01 states they were supposed to give him 60 days to remove the Yacht. The City of North Miami removed the Yacht within 3 weeks even after the Police informed Maurice Symonette that he had until that Wednesday to remove the Yacht. The City of North Miami Police came the day before that Tuesday May 17, 2016 to seize the Yacht wherein they were suppose to come the following day  Wednesday May 18, 2016. This Tuesday arrival date was stated by the Police. (Video available) Seventy Four, thousands of Tax Payers dollars have been wasted to illegally seize Mr. Symonette's Yacht. We have prepared a Timeline of Events for this Lawsuit  **(See Exhibit A – Timeline of Events).**

## Jury Trial Requested

## Demand Claim of Relief

### First Cause of Action: Violation of the 1964 Discrimination Act

The City of North Miami violated the **1964 Discrimination Act** by violating Mr. Symonette's constitutional rights in the form of threats, intimidation and coercion from **John Quirino of Quirino Construction, City Manager Larry Spring, City of North Miami Police Department and Sea Tow and Westland Towing.** Mr. Quirino also said to Mr Symonette that "Niggers cannot own Yachts, that they sink black owned Yachts to take them". Mr. Quirino and his wife called Mr. Symonette to his face

a"Nigger" and said they wanted to blow up his house for having a Yacht. The City of North Miami Police Department, the City of North Miami City Manager  Larry Spring with the Approval of City Attorney Jeff H Cazeau by way of intimidation and coercion illegally seized Mr. Symonette's Yacht. The above also committed a **Hate Crime** against Mr. Symonette according to  **FL Statue 775-085.**

The same parties also caused Mr. Symonette great emotional distress by inflicting negligent and intentional distress by illegally seizing his Yacht because he was going to refinance his Yacht to raise money for the homeless Vets at a charity concert. Intentional wrong doing and violation of civil rights were committed by all of the above mentioned parties.

(jurisdictions have a separate tort or delict of "verbal injury", "intentional infliction of emotional distress", "outrageousness", or "convicium"), involving the making of a statement, even if truthful, intended to harm the claimant out of malice; In addition, A City of North Miami Police Officer told Mr. Symonette he had until Wednesday to move the Yacht before the City came back.  Once Mr. Symonette got a crane for $3,000 to lift the Yacht on Monday Sea Tow moved in and seized the Yacht, **2 days before the deadline**. Please see Police Officer saying Mr. Symonette  had until Wednesday to move the Yacht.  (Go to Youtube.com - Search - Unlawful Boat Seize -12:06 – Police Officer speaking.)

## Second Cause of Action: Violation of FL Statue 823.11

The City of North Miami violated the statue because the Yacht was not an abandoned and derelict vessel and it did not block the public navigable waterway.  We have communicated with the 3 Agencies that the City of North Miami called to the scene to investigate. They are Fish and Wildlife, The US Coast Guard and Dade County Investigative Unit  DERM and neither felt it was necessary to write up a report that the Yacht was a public or environmental hazard. Therefore none of these Agencies ordered the Yacht to be removed. For this cause we are asking for Relief and Damages.

**823.11**    **Derelict vessels; relocation or removal; penalty.—**

(1)   As used in this section, the term:

(a)   "Commission" means the Fish and Wildlife Conservation Commission.

(b)   "Derelict vessel" means a vessel, as defined in s. **327.02**, that is left, stored, or abandoned:

1.   In a wrecked, junked, or substantially dismantled condition upon any public waters of this state.

2.   At a port in this state without the consent of the agency having jurisdiction thereof.

3.   Docked, grounded, or beached upon the property of another without the consent of the owner of the property.

This Yacht was not an environmental hazard, have a hole in it anddid not block a public waterway and was not in navigable waters. This was all confirmed by The US Coast Guard, Dade County Investigative Unit DERM and the Department of Fish and Wildlife because no one made a report to this effect because the Yacht was tied to a private dock and not considered a public hazard. The City of North Miami therefore violated their own ordinances by illegally seizing Mr. Symonette's Yacht. This cause of action is one of the reasons we are seeking relief and damages in this matter.

See City Of North Miami Beach Hold the hearing concerning this on youtube type in "short Boat vid." Or URL https://youtu.be/2kjcda76dly.

### Third Cause of Action: Violation of The City of North Miami Ordinance 10-19

The City of North Miami violated this Ordinance because they used this ordinance to illegally seize Mr. Symonette's Yacht. However, this Ordinance and Violation notice only states he can be fined up to $250.00 a day. **(See Exhibit B).** A Court Order was never received by Mr. Symonette to give the City of North Miami the authorization to legally remove the Yacht. This clearly shows Mr. Symonette's rights were violated as a resident of North Miami. This Ordinance also states that the City of North Miami can help refloat the Yacht and then only put a lien on the property.

Instead of putting a Lien on the property as even suggested by the Mayor and other City Commissioners at the Commissioners Hearing on May 26th, City Manager Springer chose to illegally seize his Yacht. **(Hearing Video available)** The Ordinance also states they can only take a sunken Yacht if the Yacht sunk in public **waters and was blocking the public waterway.** The Yacht was not sunken only tilted in the water. It was also not in public waters or blocking the navigable waterway. (video available) This was definitely not the case because the Yacht was tied to a private dock and not blocking the public waterway. This clearly shows Mr. Symonette's rights were violated as a resident of North Miami.

### Fourth Cause of Action: Violation of FL Statue 705.101.6

The City of North Miami violated this statue because Mr. Symonette had the right to claim his property within 60 days once the property was seized. He was never given this opportunity.

**FL Statue 705.101.6** states: (6) "Unclaimed evidence" means any tangible personal property, including cash, not included within the definition of "contraband article," as provided in s. **932.701**(2), which was seized by a law enforcement agency, was intended for use in a criminal or quasi-criminal proceeding, and is retained by the law enforcement agency or the clerk of the county or circuit court for 60 days after the final disposition of the proceeding and to which no claim of ownership has been made. C).For this cause of action we are claiming relief and damages.

Mr. Symonette should have been given has up to 60 days to get a sunken Yacht up and removed. But Mr. Symonette was only given 3 weeks to get the Yacht up and off the property before it was seized by the City of North Miami. A court Order was never received nor the acht sold at an auction. According to the City of North Miami Ordinance a Court Order is required to seize someone's property. **See Lozman vs City of Riviera** section II of the District Court's opinion that states that they used proper procedure Court although Mr. Lozman ultimately won the case. **See below.**

## II

At the outset we consider one threshold matter. The District Court ordered the floating home sold to satisfy the City's judgment. The City bought the home at public auction and subsequently had it destroyed. And, after the parties filed their merits briefs, we ordered further briefing on the question of mootness in light of the home's destruction. 567 U. S. (2012). The parties now have pointed out that, prior to the home's sale, the District Court ordered the City to post a $25,000 bond "to secure Mr. Lozman's value in the vessel." 1 Record, Doc. 20, p. 2. The bond ensures that Lozman can obtain monetary relief if he ultimately prevails. We consequently agree with the parties that the case is not moot. .

A Claim of ownership was made by Mr.Symonette immediately after the Yacht ws seized**. (See Exhibit C).** For this cause of action we are claiming relief and damages.

### Fifth Cause of Action: Violation of FL Statue 760.51

The City of North Miami violated the statue because violations of Mr. Symonette's constitutional rights were committed in the form of threats, intimidation and coercion from John Quirino of Quirino Construction, City Manager Larry Spring, City of North Miami Police Department and Sea Tow and Westland Towing. Mr. Quirino also said to Mr Symonette that "Niggers cannot own Yachts, that they sink black owned Yachts to take them". Mr. Quirino and his wife called Mr. Symonette to his face a"Nigger" and said they wanted to blow up his house for having a Yacht. The City of North Miami Police Department, the City of North Miami City Manager Larry Spring with the Approval of City Attorney Jeff H Cazeau by way of intimidation and coercion illegally seized Mr. Symonette's Yacht. The above also committed a **Hate Crime** against Mr. Symonette according to **FL Statue7 75-085**

The same parties also caused Mr. Symonette great emotional distress by inflicting negligent and intentional distress by illegally seizing his Yacht because he was going to refinance his Yacht to raise money for the homeless Vets at a charity concert. Intentional wrong doing and violation of civil rights was committed by all of the above mentioned parties.

jurisdictions have a separate tort or delict of "verbal injury", "intentional infliction of emotional distress", "outrageousness", or "convicium", involving the making of a statement, even if truthful, intended to harm the claimant out of malice; In addition, A City of North Miami Police Officer told Mr. Symonette he had until Wednesday to move the Yacht before the City came back. Once Mr. Symonette got a crane for $3,000 to lift the Yacht on Monday Sea Tow moved in and seized the Yacht, **2 days before the deadline**. Please see Police Officer

saying Mr. Symonette had until Wednesday to move the Yacht. (Go to Youtube.com - Search - Unlawful Boat Seize -12:06 – Police Officer speaking.)

This Yacht is worth 2 million dollars. (**See Exhibit C– Appraisal**) Mr. Symonette believes that someone associated with the City of North Miami might have caused the Yacht to be tilted by cutting the ropes tied to it. He also believes this because of the illegal way the Yacht has been seized. Furthermore, **City Manager Larry Spring refused to give him information on how w to get the Yacht back or where it is located or the salvage records.**

A civil penalty **can be brought forth by the Attorney General by bringing forth a civil action for the violation of Mr. Symonette's rights. See more details of this Florida Statue below.**

(1)  Whenever any person, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any other person of rights secured by the State Constitution or laws of this state, the Attorney General may bring a civil or administrative action for damages, and for injunctive or other appropriate relief for violations of the rights secured. Any damages recovered under this section shall accrue to the injured person. The civil action shall be brought in the name of the state and may be brought on behalf of the injured person. The Attorney General is entitled to an award of reasonable attorney's fees and costs if the Department of Legal Affairs prevails in an action brought under this section.

(2)  Any person who interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any other person of rights secured by the State Constitution or laws of this state is liable for a civil penalty of not more than $10,000 for each violation. This penalty may be recovered in any action brought under this section by the Attorney General. A civil penalty so collected shall accrue to the state and shall be deposited as received into the General Revenue Fund unallocated.

Some jurisdictions have a separate tort or delict of "verbal injury", "intentional infliction of emotional distress", "outrageousness", or "convicium", involving the making of a statement, even if truthful, intended to harm the claimant out of malice;In addition, A City of North Miami Police Officer told Mr. Symonette he had until Wednesday to move the Yacht before the City came back. Once Mr. Symonette got a crane for 3,000 to lift the Yacht on Monday Sea Tow moved in and seized the Yacht, **2 days before the deadline.** Please see Police Officer

saying Mr. Symonette had until Wednesday to move the Yacht. (Go to Youtube.com - Search - Unlawful Boat Seize -12:06 – Police Officer speaking near end of video).

In addition, there were several other violations that the City accused Mr. Symonette of that was incorrect.

The sections under City Code 10-19 to 22 under **Junk Vehicles/Property does not apply to Mr. Symonette's Yacht**.

The first paragraph refers to abandoned, derelict or junk property. Mr. Symonette's Yacht does not fit this description. (Video available). Go to Youtube.com - Search - Unlawful Boat Seize - 12:06 to show proof of illegal seizure and value of Mr. Symonette's Yacht.

**Section 1)** The Yacht has a value of 2 million dollars which is more than nominal salvage value. ( **See Exibit C– Appraisal** of Value of Yacht)

**Section 2)** Does not apply to Mr. Symonette's Yacht as he was able to get a crane to lift it out of the water

**Section 3)** Does not apply to Mr. Symonette's Yacht because it was not on public property but

But it was on Mr.Symonette's property without legislative authorization.

**Section 4)** The Yacht did not exhibit physical damage other than the ropes were cut by someone that caused the Yacht to tilt in the water. The Tow Companies were not the ones that got the Yacht up but billed The City of North Miami for the job anyway.

**Section 5)** The Yacht was put in an upright manner after Mr. Symonette got a crane to lift it out move it. The City of North Miami Police told him they would give him until Wednesday to move it. Instead, they came that Tuesday once he got it upright.

 The Tow Companies could not get the Yacht upright but seized it soon as Mr. Symonette got it upright. The City y North Miami came the day before on a Tuesday when he got it upright.  The City of North Miami Police told him he had  until Wednesday to get the boat ( Video available to show Police saying that)  (See also Timeline of Events).

**Section 6)** Since this Yacht was at a **private home dock** this section does not apply.

Sea Tow told Mr. Symonette they would charge up to 8-13 thousand to lift the Yacht. The City Manager Larry Spring said it would cost 74,750 dollars to pay Sea Tow to get the Yacht. This is a major discrepancy in price. He also stated that if the $74,750 dollars is not paid he will destroy the Yacht. However, after Mr. Symonette attended a City of North Miami hearing about the Yacht the City Manager said he would meet with Mr. Symonette to make arrangements for him to pay the $74,750 dollars to get his Yacht back. The Mayor and most of the City Commission was startled that this situation even happened and encouraged the City Manager to meet with Mr. Symonette for him to get his Yacht back. (Video available from this hearing.) However, when Mr. Symonette met with the City Manager the next day he was told the Yacht was destroyed to

Mr. Symonette's surprise. Even if the Yacht was destroyed aluminum material it is made out of is worth $ 200,000 thousand dollars for a profit for personal gain. Where are the Salvage Records and where was the Yacht destroyed?

**Mr**. Symonette even presented bankruptcy paperwork to the City to show the Yacht was in Bankruptcy at the time but it was totally disregarded. **An official order from a Judge to remove the Yacht and to destroy it was never received.**

**Meeting information from City of North Miami Commission Hearing on May 26, 2016**

The City Attorney kept quoting and stating incorrect things about the situation. Mr. Symonette feels he was doing this on purpose to cover up he and the City Manager's wrong doing. He stated the Yacht was in public waters which gave them the right to bypass the 60 day time frame to be able to remove the Yacht According to **FL. Statue 705.101.6. ( DERM, The US Coast Guard and Fish and Wildlife did not confirm this statement and is the reason they did not get involved in the matter.**

**Sixth Cause of Action: Violation of FL. Statue 705.101.3**

This statue describes abandoned property as no identifiable owner (3)  "Abandoned property" means all tangible personal property that does not have an identifiable owner and that has been disposed on public property in a wrecked, inoperative, or partially dismantled condition or has no apparent intrinsic value to the rightful owner. The term includes derelict vessels as defined in s. 823.11.

This was not the case with Mr.Symonette because all parties involved knew he was the rightful owner. The Law states that Mr. Symonette's Yacht can be retained by a Law Enforcement Agency or by the **courts on court order only when no claim of ownership is** made. Clearly the City Manager and City Attorney knew this was his Yacht and he never received a court order.

 The City of North Miami City Manger Larry Spring knew Mr. Symonette was the owner of the Yacht so it was never abandoned. The Yacht was also operable as it floated away when it was seized by The Towing Companies with The City of North Miami Police looking on.  (Video available)

**Seventh Cause of Action:  Violation of City of North Miami municode Sec.5-602.-Dock of The City of North Miami Code.**

**The City of North violated his rights with this code. Go to www2.municode then search Sec.5-602.-Dock** of The City of North Miami Code to see the code reference as to the allowed footage when using a private dock. A Yacht tied to a private dock is allowed 25 feet. Mr.

Symonette's Yacht occupied about 22 feet off his dock. This clearly shows the Yacht cannot be considered in a Public Waterway or in Navigational waters as the City Manager and City Attorney were stating unethically in the Council meeting. Video is available to show their comments. The City Attorney backed up the City Manager by stating the Yacht is a derelict boat and was submerged under water.  Video is available to show the Yacht is not a derelict boat and it was tilted and not submerged under water.  In fact the Yacht is worth 2 million even tilted in the water. City Manager Larry Spring agreed to meet with Mr. Symonette the next day after the City Council meeting on May 26, 2016 to discuss how to pay the $75,000 dollars supposedly he paid to the Tow Company,  Westbrook Towing. Instead, Larry Spring told Mr. Symonette he destroyed the Yacht after 2 days. The Tow Company said it was the City Manager Larry Spring that made the decision to destroy his Yacht the same day they towed it also with the authorization from the City Attorney Jeff H. Cazeau.

### Eighth Cause of Action: Violation of FL Statue 705.103.2b

   The City of North Miami violated this statue because to destroy an abandoned boat without first obtaining title is a crime because Florida is a Title State. See http://m.myfwc.com/boating/waterway/derelict-vessels/claims-process-faqs/ that reference Florida being a Title State. In addition, I was supposed to be given 90 days to get my Yacht back according to FL Statue 705.103.2b  **Title to lost or abandoned property.—(1)  Title to lost or abandoned property is hereby vested in the finder upon the expiration of the 90-day custodial time period specified in s. 705.103(2)(b), provided the notice requirements of s. 705.103 have been met, unless the rightful owner or a lien holder claims the property within that time.**

 Mr, Symonette was never given that opportunity to claim his property within 90 days according to the above Florida Statue because the City Manager said the Yacht was destroyed. 9Video is available showing The City Manager stating this). All of this was approved by the City Attorney. id not obtain title before the Yacht was destroyed.

Mr Symonette even presented bankruptcy paperwork to Officer Mirjah to show the Yacht was in Bankruptcy at the time it was being seized but it was totally disregarded.  An official order from a Judge to remove the Yacht was never received.

### Ninth  Cause OF action: Violation of the 14th Amendmendment you cannot take a Persons Life, Liberty or Property.

   **The City of North Miami violated this Amendment because they took Mr. Symonette's Property without following due process of Law they were supposed to have a court hearing First then get an order from the court to take possession of the yacht, none of this was done first the City of North Miami violated his life, liberty and property Mr symonette was treated as though he had no legal rights.**

## Demand Claim of Relief

We are requesting relief and damages for the above causes of action because the City of North Miami never obtained title to the Yacht.

Please see **Lozman Fane versus the City of Riviera Beach** to show that this City at least had a Court Order to auction the boat and then destroy it in which the City bought the boat at Auction. This was not the case with Mr. Symonette's Yacht.  Without a Court Order his Yacht was destroyed.

Wherefore Plaintiff Maurice Symonette, as owner of the Yacht **Victory** claim monetary damages against the Defendants in an amount that exceeds the jurisdiction of the District Court of Florida in the amount of 6,000,000 dollars for pain and suffering, discrimination and damages to be settled by a Trial Jury, plus costs, and for any further relief that this Honorable Court determines necessary and appropriate.

## Parties and Jurisdiction

Maurice Symonette is a resident of North Miami. He resides at 1977 NE 119th Road North Miami, FL 33181

Defendants operate businesses or have positions as Government Officials or Police Officers in North Miami.

City of North Miami Mayor Dr. Smith Joseph
City of North Miami City Manager Larry Spring
City of North Miami City Attorney Jeff H. Cazeau
Address for City of North Miami 1776 NE 125 Street North Miami, FL 33161

City of North Miami Chief of Police
Address for City of North Miami Police Department
1776 NE 125 Street North Miami, FL 33161

**Filed by:**

_____   **Date:** _8/18/2017_

**Maurice Symonette, Plaintiff**
1977 NE 119th Road North Miami, FL 33181
**786-859-9421**

**Defendants will be served at and mailed copies to:**

City of North Miami Mayor Dr. Smith Joseph
City of North Miami City Manager Larry Spring
City of North Miami City Attorney Jeff H. Cazeau
Address for City of North Miami 1776 NE 125 Street North Miami, FL 33161

City of North Miami Chief of Police
Address for City of North Miami Police Department
1776 NE 125 Street North Miami, FL 33161

John Quirinio of Quirinio Construction
1987 NE 119th Road Miami, FL 33181

Sea Tow Towing
1050 NW 54th Street Fort Lauderdale, FL33309

Westbrook Towing
355 NW 171st Street Miami, FL  33169



## Maurice Symonette illegal Yacht seizure Timeline

### June 12, 2016

1) April 5,2016 - Date Yacht got tilted – Ropes got cut and pump got destroyed – no police report was made.
2) April 5, 2016 - Date began working on getting the boat up.
3) April 15, 2016 received first notice. Officer Blanchard told me he sent a certified letter. I never received. The Order to Comply for May 3, 2016 I also never received. I got copies of both letters from Larry Spring's Secretary.
4) May 5, 2016 Police Sea Tow and Westbrook towing showed up to remove the Yacht weekend to get the boat up. They were not able to get the boat up, it kept falling over.
5) April 5, 2016 made up 5 weeks and 2 days we had been working to get the boat up before the Police showed up again.
6) May 15,2016, Police Officer Mcnally showed up on to tell him if he gets the boat up before Wednesday we can move the boat because it is my property.
7) May 16, 2016 me and friends got the boat up that Monday Night and was prepared to move it Tuesday Morning.
8) May 17, 2016 - Westbrook and Sea Tow came in that Tuesday Morning to take the boat 1 day before the deadline.
9) May 17, 2016 - Officer Mahjir ordered me off the boat with the threat of getting arrested if I did not get off. He also forbid me from untying the boat from my house as they began to tow the boat away. They destroyed up my air conditioning, piano and Jacuzzi by having the boat still tied to the house. Officer Patricia Fischel stood guard while they towed my yacht away.
10) May 23, 2016 - email sent to Mayor and City Council with Governor Scott's letter attached. Subject line stated Thousands of Tax dollars wasted to illegally seize Yacht.
11) May 23, 2016 – I found out when I went to City Hall that my Yacht was put on the City Council meeting for May 26, 2016 at 7:00pmYacht that was sent to the City council. As a result the Yacht was put on the City Council meeting for May 26, 2016.
12) May 26, 2016 – At City Hall Meeting I gave my scenario about what happened at the meeting including mentioning the Yacht was worth 1.2million.
13) May 26,2017 Dwetta asked Council member Scott Calvin who made very wrong statements what was his definition of a derelict boat as the Yacht was in good shape and we have video t prove it and what did he mean by the boat was abandoned when I was working on the boat for and 5 weeks and 2 days. This order did come from the Magistrate to pay the250.00 a day fine per the copy of letter I got from the City manager, Larry Spring's secretary. A Magistrate order never came for the boat to be moved which one of the notices stated that the City Attorney would have to request to even move the boat. Several of the Officers said they did not have an order from the Courts to move the boat. Dwetta also asked what did he mean the boat was submerged under water as the boat was only tilted in the water. The boat was too tall to submerge in the water as the water was only about 6 ft deep.

Pg.2

14) May 26, 2016 - The Mayor, Vice Mayor and another black council member questioned the City Manager, Larry Spring and City Attorney, Jeff Czeau heavily about why did they take the Yacht rather than put a lien on the house or the boat for money owe they owed the City. They said that should have been done to recover the 75,000 dollars the City paid to move the boat and if he paid the money he should be able to get his Yacht back. They also asked if I paid the 75,000 I should be able to get my Yacht back. The City Manager even said that he paid the Tow Company 75,000 dollars and gave them the Yacht. The Council questioned him about that about how is that possible he, the City Manager paid the Tow Company 75,00 dollars and gave them the Yacht.  The City Manager said at the meeting he would sit down and meet with me the next day. about where the boat was and how to pay the money to get the Yacht back.

15) May 27, 2016 - Ciity Manager Larry Spring agreed to meet with me the next day and he told me the Yacht got destroyed.

16) I checked with West brook and Sea Tow to see if they received 75,000 dollars to tow the boat they said no way. In fact early on Sea Tow quoted me 13 to 18,000 dollars to get the boat up.

17) All of the above incidents are on Video.

776 Northeast 125th Street, North Miami, FL 33181-3804

Exhibit [B]

## NOTICE OF VIOLATION

Number: CEJNK-2016-00690

April 15, 2016

JAMES LITTLEJOHN & ROBERT CLAR. LEROY WILLIAMS
1977 NE 119 RD
MIAMI, FL   33181-1331

Dear Property Owner and / or Occupant:

On   4/15/2016       I made an inspection at 1977 NE 119 RD

violation of the North Miami Code of Ordinances was observed :

Violation of Section:   10-19
                        (JNK) JUNK ON PROPERTY
NO PERSON SHALL KEEP, STORE, OR ALLOW TO REMAIN ON ANY PROPERTY WITHIN THE CITY ANY
DERELICT OR JUNK PROPERTY

Accordingly, the following ...

JUNK ON PROP...                    BOLES CANAL (VICTORY) ANY
VEHICLE BOX ...                    DER... OR INOPERABLE P

You are notified th...                                the next re-inspection date listed below.
to comply will result                                 summons to appear before the City of Nort
Miami Code Enforce... ...                             Special Magistrate has the power to levy fin
all ...ated code ...

Additionally, you ...                                 g the time specified for correction by the
compliance office... ...                              n Special Magistrate even if the viola
h... corrected pri...

EDMUND FITZELL                                        Re-inspection scheduled for:
CODE COMPLIANC...                                     April 24, 2016
Code Compliance ...

Exhibit [C]

·····················································

## CONDITION & VALUATION SURVEY

·····················································

FILE NO. S – 030106AAugust 1, 2011

CONDITION AND VALUATION SURVEY ALUMINUM MOTOR YACHT

"VICTORY" OFFICIAL NUMBER D- 656976 NORTH MIAMI, FLORIDA

THIS IS TO CERTIFY THAT THE UNDERNAMED MARINE SURVEYOR DID, at

the request of Mr. Maurice

Symonette, attend the aluminum motor yacht "Victory", Official Number

656976, while vessel was moored at North Miami, FL in order to ascertain

the current condition and value of vessel.

SUMMARY OF VALUES        In the opinion of the Undersigned Marine

Surveyor and Appraiser, the aluminum motor yacht Victory is estimated to

have the following values:                Current Market Value

$1,000,000.00                Replacement   Value

$ 2,000,000.00    These values are considered effective as of date of this

report and are subject to conditions and assumptions set forth below.

FILE NO. S – 030106AAugust 1, 2011      VESSEL PARTICULARS

NAME:                              M/V Victory

OWNER:    Mr. Maurice Symonette

HOME PORT:                        North Miami, FL

OFFICIAL NUMBER:                        656976

DIMENSIONS:                              Length

56.1 ft.   (LOA 74 ft)

Breadth      19.6 ft.

Depth        8.4 ft.     TONNAGE:

Gross        61.00

Net          49.00     BUILT:

1977/Dania, Florida

CONSTRUCTION:       Solid welded aluminum    EXTERIOR FINISH:
High gloss Imron ™ paint    PROPULSION:      Twin GM 12V71 Twin Turbo
Diesel    ENGINE HORSEPOWER:        550 HP Each     FUEL:       Diesel
FILE NO. S - 030106AAugust 1, 2011        CONSTRUCTION & GENERAL
ARRANGEMENT     Vessel found to be an all aluminum motor vessel
converted most recently from an excursion vessel to a private yacht.     The
vessel has a raked bow with sharp entry.   Large, tinted windows are
installed in all exterior bulkheads on the main deck and upper enclosed
passenger deck.   On the main weather deck level there is a small forecastle
area and longitudinal exposed walkways on each side of the superstructure.
The bow area contains a line and chain locker with a watertight bulkhead
and a watertight deck hatch.   A large aluminum
box contains two windlass systems and ground tackle including line, chain
and anchors.     The main deck is accessed from the water or ashore via
bulwark openings port and starboard along the after portions of the main
weather deck.   The main deck level includes the wheel house, galley, main
salon and enclosed after lounge.   The interior accommodations of the main
deck are generally accessed by four non watertight doors: two sliding doors
on either side of the wheelhouse and two hinged, acrylic doors at the end of
the outboard main weather deck walkway on the port and starboard sides
of the vessel.     WHEEL HOUSE       The wheel house on the main deck
includes the following equipment:    Ritchie 10" magnetic compass
EPIRB    Auto Remote Battery Charging System     Raytheon V-850 Color
Depth Sounder    Wood Freeman Model 500 Auto Pilot System w/Remote
Raytheon R-41X Radar     ICOM IC-M80 VHF Marine Radio Telephone

Two each Uniden VHF

Radios    FILE NO. S – 030106AAugust 1, 2011      Jabsco ITT Rayline Electric Controlled Searchlight    SITEX T-200 Radio Direction Finder Maximum, Inc Weather Instruments: Wind, Temperature & Barometer Chelsea Tide Clock    Audiovox Satelitte Stereo System including:    House stereo, PA & Intercom System including:    Kenwood Audio/Video Surround System    Sony 5 CD  Changer    Proton Cassette Deck    Niles Audio Mixer    Shure Micro-Address & Vocal Component System    24 Speakers located throughout the vessel    Wheel    Transmission and engine throttle controls    Engineering instrumentation    Deck of the wheel house is covered in varnished parquet wood.    GALLEY    The galley is accessed via a port side longitudinal passageway connecting the wheelhouse and the main salon.   The galley contains the following equipment:    Jenn-Air Electric Downdraft Convection Oven & Grill    NSF – D13630 Burner Cooking Unit FILE NO. S –

030106AAugust 1, 2011     Stainless Steel Triple Sink    GE Spacemaker Microwave Oven    Victory Reach In Cooler, Refrigerator & Chiller    Market Forge Model #4200 & Model 1000S Commercial Grade Turbo Ovens    The deck in the galley is covered with tile.    MAIN SALON    The main salon occupies the largest portion of the main deck interior space.   It is nicely appointed with mirrors, a big screen satellite TV, piano, sofa, loveseat and other complimentary furnishings.   Lighting is provided by a chandelier and lamps.   The deck is covered with carpeting.   A large, multi-colored, etched, art-glass divider depicting an underwater scene separates the main salon and the after lounge.    The after portion of the main deck interior space has been configured as a lounge.   The lounge is outfitted with a portable hot tub, table with four chairs and a TV/VCR combination unit.   Lighting is provided by overhead recessed fixtures.   The deck is covered with exterior wood arranged in a parquet pattern.   The upper lounge and swim platform are accessed from this space.   The upper lounge access is via an inclined ladder and the swim platform can be reached by opening a

two part, combination "Dutch type" door.  An aluminum ladder and hand rail installed on the transom provides the route from the main deck to the swim platform.       The swim platform spans the width of the vessel, is welded aluminum and integrated to the hull.       UPPER HELM STATION  The Upper Helm Station has a single entry point via a vertical ladder through a water tight hatch on the port side of the station.   It has a large, opening window on the centerline of the vessel.   Visibility from this station is good.        The following equipment is installed in the Upper Helm Station:  Wheel     Transmission and engine throttle controls FILE NO. S – 030106A  August 1, 2011     Engineering systems instrumentation     Magellan  GPS     Standard Horizon Eclipse VHF Radio     Spotlight Control  Datamarine LX 300 Depth Sounder     Standard Horizon VHF Radio     SRD  LABS LORAN     Ritchie 10" Compass     Barometer, Time, Tide, Wind &  Temp Instruments     Just aft of the Upper Helm Station is a full beverage bar, refrigerators, sink and soft drink dispenser system arranged to provide service to the Upper Lounge.   China, stemware and flatware settings are stowed for 130 guests.       UPPER LOUNGE     The Upper Lounge is accessed by passengers via an inclined ladder from the after portion of the main deck.   It has built in, cushioned and upholstered seating installed on the entire perimeter of the space.   Additional seating is provided by high backed stools at the bar and a large sofa.   The deck is covered with carpeting.   Bulkheads and overhead are painted and nicely trimmed with contrasting stained wood and designer upholstery fabric.   Bar lighting is recessed and lounge lighting

is achieved by "sconce" type fixtures mounted on the upright outboard window frames along each side of the lounge.   A number of TV monitors and speaker systems are installed as part of the vessel-wide entertainment system.       UPPER WEATHER DECK       The upper weather deck spans the entire length of the superstructure.   Installed forward are all masts and antennas, including the satellite TV system antenna.   The vessels heating & air conditioning equipment is also installed on the upper weather deck.

Upright stanchions and nylon line form the lifeline system for the FILE NO. S – 030106AJuly 3, 2008    upper weather deck.    Night lighting is provided by solar powered lights mounted atop perimeter stanchions.    The upper weather deck is accessed by a single inclined ladder via a large opening hatch on the starboard side, aft on the upper lounge deck.    MASTER STATEROOM    The master stateroom is one level below the main deck and is

accessed via a ladder from the port side of the main salon.    It contains three opening ports and one built in closet.    It is lighted with track lighting and free standing lamps.    Furnishings include a queen bed, night stands, bureau, roll top desk, satellite television and receiver.    Overhead is painted and bulkheads are covered with wood paneling.    Floor covering is carpeting and ceramic tile.    The vessel's mechanical fuel gauges are also mounted in the deck of this space.    MASTER STATEROOM HEAD Connected by a door to the master stateroom, this head is outfitted with a single sink vanity, full tub and shower with enclosure, mirror, Lectra-san marine toilet and an opening port.    The deck is covered with vinyl and tile. GUEST HEAD    Accessed via a passageway forward of the master stateroom, this head is outfitted with a single sink vanity, shower with enclosure, mirror, Lectra-san marine toilet and an opening port.    Deck is covered

with ceramic tile.    GUEST STATEROOMS    Port and starboard guest staterooms are accessed via passageway and quick acting watertight door forward of the master stateroom and guest head.    Each guest stateroom includes two opening ports, a closet, a bunk, a desk, bulkhead mounted lights, carpeted decks, paneled bulkheads and individual heating and air conditioning controls.    CAPTAIN & CREW QUARTERS    Accessed via an inclined ladder from the port side of the main deck inside the wheelhouse. This space has a washer dryer combination unit, two bunks, a closet, built in drawers and individual heating and air conditioning controls.    A small head with sink, porti potti and a handheld shower is also in this space.    FILE NO.

S - 030106AAugust 1, 2011    ENGINEERING SPACE & EQUIPMENT
Engine room access is gained via a ladder through a water tight hatch from
the main deck level aft.   Deck in engine room is aluminum grating.
Engines are very
accessible from all sides.   Emergency engine shutdowns and emergency
fuel shutdowns are located next to the entrance hatch on the main deck.
All are clearly marked.   Auto/manual bilge pump switches are located in
the panel on the forward bulkhead and are clearly marked.   Onan
generator set is wrapped in a sound shield.   Westerbeke genset is not
sound insulated.   Main engine exhaust lagging is in good condition and
includes stainless fittings and flex piping to fiberglass mufflers.   Manual
gauges are mounted inboard above engines.       Propulsion:  Twin GM
12V71 Diesels with Twin Disc MG514 Gears    Vessel controls: Hynautic
steering & Hynautic engine controls    Electrical service:  12, 24, 32,110
and 220 volt service through three 25KVA transformers located in the
engine room.       Shore power:  3, 50 amp, 220 volt shore connectors to
transformers    Circuit protection:  Trip type circuit breakers and fuses.
Batteries:  Four 8D
batteries in boxes.   Separate batteries for generators.    Bilge pumps:
Bilge pumps installed under crew quarters and in engine room.       Air
conditioning:   Chiller type unit with air handlers throughout vessel.
Potable water system:   Pressure system with 20 gallon hot water heater.
650 gallon tank forward with sight gauge in bilge forward compartment.
Generator:  Onan 32KW    Generator:  Westerbeke    Fuel system:  2,100
gallon capacity in four aluminum tanks located amidships under master
stateroom area.    Additional equipment:  Campbell Hausfield compressor.
FILE NO. S - 030106AAugust 1, 2011    LIFESAVING AND FIRE FIGHTING
EQUIPMENT    Portable fire extinguishers mounted throughout vessel
First Aid Kit    USCG approved life vests    One fire fighting hose w/nozzle
at engine room hatch    Flare Kit    PHYSICAL CONDITION    1.   Vessel
surveyed while moored without removal of sheathing, ceilings, or bolted

enclosures to expose parts ordinarily concealed, or testing for tightness, or operating any equipment.   No determination of stability characteristics or inherent structural integrity has been made and no opinion is expressed thereto.     2. Vessel housekeeping considered very good and above average.     3. Interior of vessel painted and fitted with wood trim and cabinetry, wood/plastic overheads with flooring as noted.   Interior in very good condition.     4.   External superstructure coating in good condition.   5. Visible areas of external hull overall in good condition.     6.   Engine room bilges without excessive oil and water.     7. Engine room coatings in good condition; housekeeping good.     DEFINITION OF VALUES
Current market value is defined as a sum of money that a vessel should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller both acting prudently, knowledgeably, and assuming the
price is not affected by undue stimulus.   Implicit in this definition is the consummation of a sale whereby title is passed from seller to buyer under conditions whereby:     FILE NO. S  -  030106AAugust 1, 2011   a. Buyer and seller are typically motivated;     b. Both parties are well informed and acting in what they consider their own best interests;   c. A reasonable time is allowed for exposure on the open market.   Replacement cost (new) is based on the cost of construction of a vessel of similar size and capacity in today's market.   Remaining economic life is defined as the amount of time (in years) that a vessel can be expected to remain fit for its intended service assuming the continuance of proper maintenance programs and adherence to recommendations set forth in survey report.   METHODOLOGY   The above noted market value was arrived at after determining the estimated reproduction cost of the vessel, depreciated for age,
considering the anticipated remaining useful life, and adjusted for condition of the vessel, current market conditions and comparable sales.
Replacement cost was arrived at by obtaining area standard quotes for new construction of similar sized vessels.   Copies of market search data are

attached.   CERTIFICATION   1.   The statements and opinions expressed in this report are correct to the best of my knowledge and belief.

2.   The report analysis, opinions, and conclusions are my personal, unbiased professional analysis, opinions and conclusions.   3.   My compensation is not contingent on an action or event resulting from the analysis, opinions or conclusions in, or the use of this report.   4. My analysis, opinions and conclusions were developed, and this report has been prepared using the general guidelines set forth in the Uniform Standards of Professional Appraisal Practice.   5.   An inspection of the vessel,

which is the subject of this report, has been made by staff surveyor, Captain Jess Cooley.   FILE NO. S - 030106AAugust 1, 2011   6. This survey was undertaken and the survey report is submitted without prejudice and for the benefit of whom it may concern.   It is based on the observations and discussions of the undersigned at the time of the survey.   In this report, no reference should be construed to indicate any of the following: evaluation of the internal condition of any onboard equipment or systems and the propulsion systems operating capacity.   This vessel was surveyed without the removal of any parts, fittings, carpet, decking, sheathing, wires, plumbing, joiner work, etc ···   Additionally, no haul out or sea trials were conducted during this inspection.   7.   This report is issued subject to the condition that neither the surveyor, nor his employing firm, are to be held liable for errors of any kind.   This includes any omission, negligence, inaccuracy, misrepresentation or misstatement in this report, or the performance of the marine surveyor.   This report represents only a statement of general observed conditions and is neither a guarantee nor a warranty of the condition of the vessel, its hull, machinery, unforeseen or undetected damages, or other conditions that may exist.   By signing below, the individual employing the services of the surveyor accepts the terms of performance, limitations and exclusions noted above.

Offered:   _Jess H Cooley_   Jess H Cooley LCDR, USN (Ret)

Accepted: _Maurice S_                    Owner      Date: 04/23/13
_Maurice Symonette_



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

0Commandant
United States Coast Guard

2703 Martin Luther King Jr Ave SE
Stop 7501
Washington, DC 20593-7501
Staff Symbol: CG-INV-3
Phone: (202) 372-1042
Fax: (202) 372-8354
Email: Myisha.R.King@uscg.mil

5720
FOIA 16-CGFO-02740
September 23, 2016

Ms. Dwetta Hunter
Dhu1273865@aol.com

Dear Ms. Hunter,

This is in response to your August 22, 2016 Freedom of Information Act (FOIA) requests to the U.S. Coast Guard (USCG) concerning the incident (Activity number 5848731) concerning the vessel VICTORY on April 6, 2016. This office received your request on September 21, 2016.

Per your telephone conversation on September 21, 2016 with Ms. Myisha King of my staff, it is our understanding that you do not request the following information: names of persons who are third parties or witnesses and names of Junior Coast Guard personnel. It is also our understanding that you agree to modify your request to receive the Incident Management Activity 5848731.

We are granting your request under the FOIA, Title 5 U.S.C. § 552, as amended, and DHS' implementing regulations, 6 CFR Chapter I and Part 5. After carefully reviewing the responsive documents concerning the vessel VICTORY on April 6, 2016, I determined that they are appropriate for public release

A search of concerning the vessel inspection for the vessel VICTORY on April 5, 2016 in the Marine Information Safety Law Enforcement System (MISLE) database found no records responsive to your request. The search looked for following keywords: "VICTORY", "656976", "Certificate of Inspections ", " April 3, through April 9, 1990". This record search was conducted on September 23, 2016 by Ms. Myisha King, FOIA Specialist, of Commandant (CG-INV-3). We conducted a reasonable search for records responsive to your request and conclude there are no responsive records.

This is not a denial. You may appeal the adequacy of our search. Your appeal must be made in writing and you must submit it within 90 days from the date of receipt of this letter. Your letter should indicate that you are making an appeal based on a "no records" determination of a request made under the Freedom of Information Act and the envelope should be prominently marked "FOIA Appeal." Include in your appeal the reason(s) why you believe the search was inadequate and a copy of this letter. Send your appeal to:

> Commandant (CG-611)
> U.S. Coast Guard
> Attn:  FOIA/PA Officer
> 2703 Martin Luther King Jr Ave SE, Stop 7710
> Washington, DC  20593-7710

While an adequate search was conducted, if you need any further assistance or would like to discuss any aspect of your request, please contact the (Unit/Directorate) that processed your request. You may send an e-mail to efoia@uscg.mil, call 202-475-3522, or you may contact our FOIA Public Liaison in the same manner. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.

16-CGFO-02740

You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Provisions of the FOIA allow us to recover part of the cost of complying with your request. In this instance, because the cost is below the $14 minimum, there is no charge.

We have enclosed all of the available information requested in your email of August 22, 2016, as amended by the telephone conversation reference above. If this does not reflect your understanding, please advise me in writing within twenty days from the date of receipt of this letter.

Sincerely,

D. PATTERSON
Chief, Data Administration Division
U.S. Coast Guard
By direction

Enclosure:     (1)  Incident Marine Information for Safety and Law Enforcement on printouts
               (2)  Incident Activity 5848731
               (3)  2 Pages Released

Copy: CG-DCO Directorate FOIA Coordinator

2

# Case Report

**MISLE Case Id:** 1019859   **Opened Date:** 06APR2016 20:57Z   **Scheduled End Date:**

**Status:** Closed - Agency Action Complete

**Title:** MV VICTORY/ Oil Discharge

**Incident Type/Subtype:** Marine Environmental Protection / Pollution - Oil

**SMC/IC:** Sector Miami

**Activities:**

**MISLE Activity Id:** 5848731   **Title/Description:** MV VICTORY / Oil Discharge
**Enf Activity Id:**
**Incident Summary:**   Sector Miami received a report of a sunken vesse in Miami, FL
**MISLE Attachments:**

**MISLE Activity Id:** 5850159   **Title/Description:** MV VICTORY / Oil Discharge
**Enf Activity Id:**
**Incident Summary:**
**MISLE Attachments:**

**MISLE Activity Id:** 5852420   **Title/Description:** MV VICTORY / Oil Discharge
**Enf Activity Id:**
**Incident Summary:**
**MISLE Attachments:**

P
FM: SECTOR MIAMI
TO:
INFO:
BT
UNCLAS //N16130//
SUBJ: MARINE ENVIRONMENTAL PROTECTION/POLLUTION - OIL/VICTORY/VICTORY/LAT: 25°50.9 N
LONG: 080°08.3 W
PERIOD: 060000Z APR 16 - 082359Z APR 16
1.   SITUATION.
A.   CURRENT STATUS: CLOSED - AGENCY ACTION COMPLETE
B.   NOTIFICATION: 06 APR 2016 ███████████ , NRC NOTIFICATION
C.   NARRATIVE: SECTOR MIAMI RECEIVED A REPORT OF A SUNKEN VESSE IN MIAMI, FL
D.   INVOLVED SUBJECTS:
PERSON NAME: ██████████████ , DOB: , ROLE: OWNER
PERSON NAME: ██████████████ DOB: , ROLE: SUBJECT OF INVESTIGATION
VESSEL NAME: VICTORY, VIN: 656976, CALL SIGN: WBO4051, FLAG: UNITED STATES, GROSS TONS:
61, LENGTH: 56.1, CLASS/TYPE/SUBTYPE: RECREATIONAL/GENERAL/GENERAL, LPOC: NPOC:
VESSEL NAME: VICTORY, VIN: 656976, CALL SIGN: WBO4051, FLAG: UNITED STATES, GROSS TONS:
61, LENGTH: 56.1, CLASS/TYPE/SUBTYPE: RECREATIONAL/GENERAL/GENERAL, LPOC: NPOC:
WATERWAY NAME: 3320 NE 165TH ST. MIAMI, FL.  (MAULE LAKE), ROLE: LOCATION
E.   WEATHER:
NO WEATHER DATA RECORDED
7.   ACTION TAKEN:
061119Z APR16: INITIAL NOTIFICATION - NRC INCIDENT DESCRIPTION
REPORT TAKEN BY: MST2 ████
INCIDENT TYPE: VESSEL
INCIDENT CAUSE: VESSEL SINKING
AFFECTED AREA: ATLANTIC OCEAN
AFFECTED MEDIUM: WATER
_____
061525Z APR16: REQUESTED TIME
061555Z APR16: LAUNCH TIME AND LOCATION
061604Z APR16: ON SCENE/CSP TIME AND LOCATION
061705Z APR16: DEPART TIME AND LOCATION
061829Z APR16: SORTIE END TIME AND LOCATION
081738Z APR16: PRT ARRIVED ON SCENE AND DISCOVERED THAT THE VESSEL NO LONGER CONTAINED
ANY OIL.  CASE CLOSED.
8.   PLANS AND RECOMMENDATIONS:
9.   AMPLIFYING INFO:
10.   SORTIE DATA:
B. UNIT: SECTOR MIAMI, RESOURCE ID: CHEVY MALIBU, RISK ASSESSMENT: GREEN:16, TIME ON
SORTIE: 02:34 TIME SEARCHING: 01:00
11.   MISLE CASE ID: 1019859

http://mislescprod.osc.uscg.mil/web/desktop/Uscg.Osc.Misle.Infrastructure.Shell.applicat
ion?workflow=107&entityId=1019859

< 8 Results for myisha

**RE: [Non-DoD Source] Re: FOIA Request 2016-CGFO-02740**

**From:** King, Myisha R CTR <Myisha.R.King@uscg.mil>
**To:** dhu1273865 <dhu1273865@aol.com>
**Date:** Mon, Sep 26, 2016 9:08 am

smime.p7s (7 KB)

Good Morning Ms. Hunter,

I have provide you with all available information on the vessel VICTORY for the year of 2016.

Kindest Regards,
Ms. Myisha King

FOIA Specialist, CTR
U.S. Coast Guard Headquarters
COMMANDANT (INV-3)
Attn: FOIA Division
U.S. Coast Guard Mailstop 7213
2703 Martin Luther King Jr. AVE, SE
Washington, DC 20593-7213
Direct 202-372-1042

-----Original Message-----
From: dhu1273865@aol.com [mailto:dhu1273865@aol.com]
Sent: Saturday, September 24, 2016 11:01 PM
To: King, Myisha R CTR
Subject: [Non-DoD Source] Re: FOIA Request 2016-CGFO-02740

Thanks for everything Myisha. The Yacht was actually at a different property address on April 5 of the week of April 5, 2016 when the Coast Guard was there. That address was 1977 NE 119th Road North Miami, FL 33181. Can you check to see if there is an incident report regarding that address. Thanks in advance.


Dwetta Hunter


-----Original Message-----
From: King, Myisha R CTR <Myisha.R.King@uscg.mil>
To: dhu1273865 <dhu1273865@aol.com>
Sent: Fri, Sep 23, 2016 12:16 pm
Subject: FOIA Request 2016-CGFO-02740


Good Afternoon Ms. Hunter,

Here are your requested documents.

Kindest Regards,
Ms. Myisha King

FOIA Specialist, CTR
U.S. Coast Guard Headquarters
COMMANDANT (INV-3)
Attn: FOIA Division
U.S. Coast Guard Mailstop 7213
2703 Martin Luther King Jr. AVE, SE
Washington, DC 20593-7213
Direct 202-372-1042

NORTH MIAMI
FLORIDA

CERTIFIED MAIL N°. 7013 3020 0001 0551 4425
April 14, 2016

Mr. Maurice Symonette
1977 NE 119 Road
North Miami, FL 33161

Dear Mr. Symonette:

On April 5, 2016, your boat was reported as sunk behind the above location. This is a violation of the below listed State Law. This sunken boat has been deemed a navigational hazard and must be salvaged immediately.

Please make all necessary arrangements with a salvage company and comply with this State Law within 10 days of receipt of this letter. Failure to do so may constitute a lien against the vessel and the property for the costs incurred by the City. Your anticipated cooperation with this matter may preclude you from possible criminal charges.

823.11  Derelict vessels; relocation or removal; penalty.—

(2)   It is unlawful for a person, firm, or corporation to store, leave, or abandon any derelict vessel in this state.

(3)   The commission, officers of the commission, and any law enforcement agency or officer specified in s. 327.70 are authorized and empowered to relocate, remove, or cause to be relocated or removed a derelict vessel from public waters if the derelict vessel obstructs or threatens to obstruct navigation or in any way constitutes a danger to the environment, property, or persons. The commission, officers of the commission, or any other law enforcement agency or officer acting under this subsection to relocate, remove, or cause to be relocated or removed a derelict vessel from public waters shall be held harmless for all damages to the derelict vessel resulting from such relocation or removal unless the damage results from gross negligence or willful misconduct.

(5)   A person, firm, or corporation violating this section commits a misdemeanor of the first degree and shall be punished as provided by law. A conviction under this section does not bar the assessment and collection of the civil penalty provided in s. 376.16 for violation of s. 376.15. The court having jurisdiction over the criminal offense, notwithstanding any jurisdictional limitations on the amount in controversy, may order the imposition of such civil penalty in addition to any sentence imposed for the first criminal offense.

Sincerely,

Larry M. Spring, Jr., CPA
City Manager

c     Chief Leonard Burgess

776 NE 125 Street | North Miami | Florida | 33161     305.895.9888    Fax: 305.893.1367